Helene OBOLENSKY, Plaintiff, Appellant,

v.

Raoul SALDANA SCHMIER, Defendant, Appellee.

No. 7198.

United States Court of Appeals
First Circuit.

April 16, 1969.

---

Richard deY. Manning, New York City, on brief for appellant.

Alex Gonzalez, San Juan, Puerto Rico, with whom Gonzalez & Rodriguez, San Juan, Puerto Rico, was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This suit for medical malpractice arises out of defendant's treatment of an injury to plaintiff's knee. The case was tried to the district court sitting without a jury. After taking the case under advisement the court made findings of fact and conclusions of law which resulted in dismissal of the complaint. The case is here on plaintiff's appeal.

On February 5, 1965, plaintiff, a forty-five year old fashion editor of Redbook magazine who was in Puerto Rico on a photography assignment, fell and injured her left knee while taking photographs in the countryside near San Juan. Shortly after the accident she was driven to a clinic in Manati where a general practitioner named Dr. Mendez took X-rays, diagnosed the injury as a fracture and placed the knee in a cast. Thus immobilized the knee was extended and flexed at an angle of 5° to 8°. Plaintiff was then transported by ambulance to Teachers Hospital in Hato Rey, a suburb of San Juan. Upon her arrival there, more X-rays were taken of the knee while still in the original cast. The defendant, Dr. Raoul Saldana Schmier, an orthopedic surgeon, was called and he visited the plaintiff in the hospital early that evening. During this visit plaintiff told him of her plans to return to New York by plane the following day. She testified that defendant told her the cast Dr. Mendez had put on was "inadequate and antiquated," that she could not travel in a straight knee cast and that he would have to put her knee in a bent position so that it would not become stiff. Later the same evening the defendant put on a new cast which flexed plaintiff's left knee to an angle of 64°–65°. The next morning (February 6) X-rays were taken of the knee in the new cast. According to plaintiff, after the defendant examined these X-rays he recommended that plaintiff undergo an immediate operation but she demurred. That evening she went by ambulance to the airport and took the plane to New York.[1] Upon her arrival in New York she was taken by ambulance to The Presbyterian Hospital where additional X-rays were taken. Immediately thereafter Dr. Frederick S. Craig, a New York orthopedic surgeon, performed an open reduction on her knee.

The injuries to plaintiff's knee were threefold: depression of the tibial plateau, widening of the tibial condyles and

---

[1]. Plaintiff was placed across three seats on the plane with the separators between the seats removed.

[2]. The tibia is the inner and thicker of the two bones of the leg between the knee and the ankle. The injury complained of involved the tibial plateau which forms the lower part of the knee joint. A condyle is a rounded protuberance on a bone serving to form an articulation with another bone.

dislocation of the knee.[2] Dr. Craig testified that in his opinion the open reduction he performed was necessary "because of the width of the tibial condyles spread, because of the displacement of fragments to prevent an unstable knee."

It is plaintiff's position that the defendant in flexing her knee to approximately 65° departed from the recognized standards of orthopedic practice and thereby greatly aggravated the original injury. In dismissing the complaint the district court found (1) that the plaintiff did not show by a preponderance of the evidence that by defendant's flexing of the knee to the 65° angle further damage was done to the tibial plateau or that such flexing caused a further widening of the condyles; (2) that although the flexing was unnecessary it was not negligence to have so flexed the knee, and (3) that even if defendant were negligent in so doing it was not established by a preponderance of the evidence that the flexing was the proximate cause of plaintiff's disability.

█ On appeal, plaintiff contends that in light of the credible medical evidence, particularly that of her two experts, the trial court erred in making these findings. In this connection we point out that plaintiff has a heavy burden; the findings of fact made by the trial court are not to be lightly overturned. Fed.R.Civ.P. 52(a).

With this in mind, we turn first to the critical question of whether the trial court's finding of lack of proximate cause was clearly erroneous. On this issue plaintiff offered the testimony of two expert witnesses, Dr. Craig and Dr. Cauchoix. Dr. Cauchoix in November 1965 removed the metal plate and the screws which Dr. Craig had inserted in plaintiff's leg in February 1965. Both of these experts admitted that the X-rays taken by Dr. Mendez shortly after plaintiff's fall showed some depression of the plateau and widening of the condyles. In addition, Dr. Craig saw subluxation (dislocation) in one of these early X-rays. He testified, however, that flexing the knee to an angle of 64° caused an increase in the widening of the condyles, and Dr. Cauchoix was of the opinion that after this flexing there was a "big collapse of the tibial plateau." On the other hand, the defendant's experts, Drs. Lugo and Horn, also orthopedic surgeons, while pointing out the difficulty of comparing the various X-rays taken at different angles, made such a comparison and testified that the injuries complained of were sustained in plaintiff's original fall. Dr. Lugo testified that the difference of the angle at which the X-rays were taken would create the illusion of greater spreading between the condyles. This opinion was shared by Dr. Horn who also stated that from his examination of the X-rays taken before and after defendant flexed plaintiff's knee, he could not "see any change whatsoever" in the fragment position of the knee. After examining the X-rays himself the trial judge concluded,

"It makes sense to a layman that the tibial plateau would be broken and depressed, when you consider the force necessary to produce the breaks shown to the tibia and which occurred at the time of impact. This court does not find any substantial increase in this depression or in the widening as shown on T-3 or T-4, [the X-rays taken at Teachers Hospital after defendant had flexed plaintiff's knee] and concludes that plaintiff has not shown by a preponderance of the evidence that by the flexing further damage was done to the plateau or that it caused a further widening of the condyles.

"In addition to the court's findings from the X-rays it is to be observed that Drs. Lugo and Horn do not find the changes between T-1 and T-2, [the X-rays taken at Teachers Hospital while plaintiff's leg was in the original cast] and T-3 and T-4 which plaintiff claims, and that Drs. Lugo

and Horn conclude that defendant's treatment was proper."

■ Plaintiff argues that the opinions expressed by Drs. Horn and Lugo as to what the X-rays disclosed were of no probative value since both of these experts pointed out the difficulty in comparing X-rays taken from different angles. We think it apparent, however, that they were merely trying to show the difficulties inherent in such a comparison, but in doing so did not disqualify themselves from reading the X-rays as best they could. It was for the court to say whether their opinions had probative value.

■■ Plaintiff next asserts that defendant's experts lacked sufficient familiarity with the X-rays to testify competently with reference to them.[3] Also, that these two orthopedic surgeons who had been practicing in Puerto Rico for many years and knew the defendant, were biased in his favor. We think both of these contentions fall within the rule that credibility is for the trier of fact. Scott v. Spanjer Bros., Inc., 298 F.2d 928, 931–932, 95 A.L.R.2d 383 (2d Cir. 1962); see Geer-Melkus Construction Co. v. United States, for Use of Bison Construction Co., 302 F.2d 181 (8th Cir. 1962).

During cross-examination defendant stated that as a result of bending plaintiff's knee there had been a change in relationship of the bone fragments as he had anticipated. Plaintiff argues that these "highly damaging admissions" were not considered by the district court in its conclusion that the flexing did not cause further damage to plaintiff's knee. To begin with, we question whether defendant's statement when taken in context should be considered to be a damaging admission. Moreover, plaintiff does not point to anything that supports her speculative allegation that the trial court did not consider this statement. The fact that the court did not specifically mention this evidence in its opinion does not mean that it did not consider it.[4]

■ Finally, plaintiff alleges that the trial court misconceived her claim in that it determined only that the flexing of the knee did not cause her present condition of osteoarthritis. She asserts that the mere fact that Drs. Craig and Cauchoix may have corrected the results of defendant's treatment through surgery does not exempt defendant from liability for the two operations, medical expenses, loss of employment and pain and suffering, all of which she claims were directly attributable to his negligence. Although the court discussed plaintiff's condition of osteoarthritis at some length we think a plain reading of its opinion shows that the court was primarily concerned with whether there was a causal relationship between plaintiff's injuries and defendant's treatment. On this issue the testimony of plaintiff's and defendant's experts was in direct conflict. The court, however, had the advantage of seeing these experts and evaluating their testimony in the light of the X-rays which were before it. Under these circumstances we cannot say that the trial court was clearly wrong in finding that plaintiff did not prove by a preponderance of the evidence that the flexing was the proximate cause of plaintiff's disability.

In view of this holding we find it unnecessary to decide the other issues raised in this appeal.

Affirmed.

---

3. It was brought out that Dr. Lugo saw the X-rays for the first time on the day of the trial and Dr. Horn had studied them for about one-half hour.

4. In its memorandum opinion the court stated: "As indicated, *the entire record* leads the Court to the conclusion that Mrs. Obolensky's present condition is no different than it would have been had she never stopped at the Teacher's Hospital. With the burden of proof on plaintiff, the claim must fail." (italics ours)